[No. 2126.]

Iven Thompson v. The State.

1. Practice — Jury Law.— Trial courts can, ordinarily, act upon excuses tendered by a special *venireman* only when he has been called, placed in the jury box, and sworn to answer questions touching his qualifications to serve as a juror; and, ordinarily, it is only by the consent of parties that an excuse can be accepted from a juror unless he is present and makes it in person.

2. Same.— If, however, upon the call of the *venire* it satisfactorily appears that a *venireman* whose name is called is absent on account of sickness or other unavoidable cause over which he has no control, the court is authorized to excuse him. But when the court exercises this authority without the consent of parties, or over the objection of the defendant, it should be

only done upon the most satisfactory evidence of unavoidable necessity, and even then, an attachment is available to test the *bona fides* of the excuse. Upon the certificates of physicians certifying to their sickness, the *veniremen* excused in this case were excused when their names were called regularly on the list. To this action of the court the defendant excepted. *Held*, that, as the defense failed to apply for an attachment to verify the *bona fides* of the excuse, this court will not revise the action of the trial court.

3. SAME — QUALIFICATIONS OF JURORS.— A juror is not disqualified by the mere fact that he has heard the evidence adduced on a former trial of the case. It follows that a juror who answers on his *voir dire* that, though he has heard the evidence adduced in the trials of the defendant's co-defendants, and approved their conviction, he had no opinion as to the guilt or innocence of the defendant, and could try him fairly and impartially, is not thereby disqualified. The disqualifying conclusion must involve the guilt or innocence of the *accused*, to the extent that it will influence his verdict.

4. SAME.— A mere impression, founded upon the testimony elicited on a former trial of the case (or the trial of accomplices), unless it will influence his judgment in finding a verdict, will not disqualify a juror.

5. SAME.— The copy of the *venire facias* served on the defendant contained the name of *D. W. H.* as a *venireman*. When the name was called, *W. D. H.*, the father of D. W. H., who lived with him, answered, and it was shown that W. D. H., and not D. W. H., had been summoned. The court sustained the defendant's objection to W. D. H., and stood him aside, but refused an attachment for D. W. H. *Held*, correct, because the proper practice is to stand aside a juror who was misnamed in the copy of the special *venire* served upon the defendant, and an attachment is available only to bring before the court a juror who has been summoned and is absent.

6. SAME.— Persons with conscientious scruples against the infliction of the death penalty are incompetent jurors, notwithstanding the statute permits the jury to assess the punishment at imprisonment for life.

7. SAME.— One of the disqualifications of a juror is that he has served as a juror for six days during the preceding six months in the district court or during the preceding three months in the county court. *Held*, that service as a juror for but *four* days is not a disqualification.

8. SAME.— The trial court did not err in refusing to permit the defendant to challenge a juror peremptorily after he had exhausted his twenty peremptory challenges. His recourse against an objectionable juror at such time was by challenge for cause, and, if the court had erroneously forced the juror upon him, the error would be ground for reversal.

9. SAME — EVIDENCE.— The trial court properly permitted a witness to testify that, immediately after the shooting, he heard the voice of one of the defendant's accomplices exclaim: "Oh yes, boys, that got him!" because, being made at the time and place of the homicide, the exclamation was part of the *res gestæ*. The rule is that whatever is said or done at the time of the transaction by any of the participants is a part of the transaction itself, and is not hearsay.

10. SAME.— A State's witness having described the peculiarity of a certain track seen by him at the place of the homicide was permitted, over objection, to testify that, thereafter, at the examining trial he saw on the foot of one of the defendant's alleged accomplices, a boot which would have made such

a track as the one he saw at the said place. *Held*, correct, the evidence being admissible in this case as tending to throw light upon the transaction.

11. SAME.— In view of evidence of a conspiracy between the defendant and his alleged accomplices, K. and H., to kill the deceased, it was proper, in order to show motive, to permit the State to prove the ill feeling existing, prior to the homicide, between K. and H. and the deceased.

12. SAME.— It was not error to permit the constable who served the process in certain cases pending in the justice's court to testify that he knew such cases were or had been pending in the said court, without first producing the record of the justice's court. But if the record was the best evidence, the ruling in this case was immaterial error, inasmuch as the matters pertaining to the cases in the justice's court were proved by other legitimate evidence.

13. SAME — CONFESSIONS — CASE STATED.— A confession, to be admissible in evidence if the party was in custody or arrest when it is made, must be "freely made without compulsion or persuasion," and voluntarily made after he has first been cautioned that it may be used against him. The rigor of this rule, so far as it relates to promises, has been so qualified that the courts now hold that there must be a positive promise made or sanctioned by a person in authority, to justify the exclusion of the confession. In this case the constable who transported the accused from the place of his arrest to the jail of the county in which the offense was committed took him by the scene of the crime, when the accused, still unwarned, made a full confession of his complicity in the murder, and expressed his fear of mob violence. The constable guarantied him protection, and remarked to him that if, upon his arrival at the jail, "he would tell the sheriff what he had told him, and go before the grand jury, he might come clear, or maybe he would not be prosecuted." Upon his arrival at the jail, the defendant sent for the sheriff, to whom, in the presence of another, after due warning by the sheriff as to the possible consequences of his statement, he made, without promise or inducement, a full confession of his complicity in the crime. The confession to the sheriff was admitted in evidence, but that to the constable was not introduced. The objection was that the confession was made by the accused under the hope that he would be permitted to turn State's evidence. *Held*, first, that the promise, if made, or hope if given, was made or given by the constable after the confession was made. Second, the constable's statement to the accused was not a promise, nor even advice, but merely a suggestion or opinion. Third, even if a promise, it was not a *positive* promise, such as, under the rule announced, will operate to avoid a confession.

14. SAME.— If a party in custody, charged with crime, freely and without compulsion sends for the prosecuting officer and proposes to confess, and the officer first cautions him that his confession may be used against him, the confession will be admissible though the accused may have made it in the hope of immunity. Fear of legal punishment is not such compulsion as deprives the accused of his freedom of action in the premises, especially if he was first cautioned that his confession might be used against him. *Held*, that the confession of the accused to the sheriff was properly admitted in evidence.

15. SAME.— EVIDENCE of what transpires in the grand jury room is only admissible when, in the judgment of the trial court, it becomes material to the administration of justice that it should be allowed. *Held*, in view of the

rule, and the facts of this case, the court did not err in refusing to compel a grand juror to disclose on the witness stand the defendant's statements in the grand jury room as to the inducements under which he made the confessions to the constable and the sheriff.

16. SAME — JURY LAW — OATH OF A JUROR. — A person is not ineligible to the position of deputy district clerk because he is by profession an attorney-at-law. The district clerk being sick, the last six of the jurors in this case were sworn by his deputy. The defendant objected because the deputy was an attorney of the court. *Held*, that it not being shown that the deputy clerk was interested as an attorney in the case, or otherwise, the objection is without merit.

17. MURDER — FACT CASE. — See the statement of the case for evidence held sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Van Zandt. Tried below before the Hon. F. J. McCord.

The indictment charged the appellant, Tom Kennedy and Scott Hendricks jointly, with the murder of Edmond Hill, in Van Zandt county, Texas, on the 17th day of August, 1883. The appellant was tried alone, a severance having previously been awarded, and was convicted of murder of the first degree, his punishment being assessed at a life term in the penitentiary.

Ike Runnells was the first witness for the State. He testified that he was twenty years of age and was a resident of Smith county, Texas. He knew the defendant on trial, and also one Tom Kennedy and one Scott Hendricks. He knew Edmond Hill before his death. The said Hill was shot to death about three miles from his home in Van Zandt county, Texas, about 10 o'clock in the morning on the 17th day of August, 1883. The witness was with the deceased when he was shot. They were in a two-horse wagon *en route* from John Y. Green's mill to Tyler, with a load of meal. Witness and deceased were sitting side by side on a sack of meal when the fatal shots were fired. Those shots were fired from ambush about one and a half miles from Green's mill. Three shots in all were fired, two of them from behind a tree top about twelve steps from the road, and it was one of those two shots that killed the deceased. Just after the two shots were fired, the witness heard a voice say: "Oh, yes, boys, that got him." The witness took that voice to be the voice of Scott Hendricks. When the guns were discharged, the two mules took fright and ran off down the road. Deceased, as soon as shot, fell over on the witness, and witness held the body until it fell out of the wagon. When the mules had run perhaps a hundred yards, the witness sprang out of the wagon and ran off, northwards, through the woods, to Frank Clemmons's house,

about two and a half miles from the place of the shooting. As the witness sprang from the wagon a third shot was fired. All of the shots mentioned were fired from shot-guns. The witness knew that fact not alone by the reports which he recognized as shot-gun reports, but by the manner in which the deceased was shot. Deceased was shot through the head and neck, from the right side, with five or six "blue whistler" buck shot. Witness remained at Frank Clemmons's house about one hour, when Joe Taylor came for him. From Frank Clemmons's house, he rode behind Taylor on a mule to the house of Melissa Hill. On their way back, witness and Taylor met Tom Kennedy and Scott Hendricks. This meeting was between 12 and 1 o'clock, at the Adrian crossing of the Neches river, which crossing was about one mile from Tom Kennedy's house, on the road leading from his house to the Hopewell church. Kennedy and Hendricks were traveling towards Hopewell church. Witness and Taylor went to the place where Hill was killed, and found on the ground some gun-wadding torn from the Tyler Democrat and Reporter newspaper, and some brown wrapping paper. He found also the tracks of three men, where they had stood. One of the tracks was made by a number eleven brogan shoe, another by a number eight or nine box-toed shoe, and the third by a neat sharp-heeled number eight or nine boot or shoe.

Cross-examined, the witness stated that he was about eighteen years old at the time of the killing. The killing occurred on Friday, and the witness came to Hill's house on the preceding Saturday. The place of killing was about one mile from Louis Johnson's house, which house was situated about a half mile from Green's mill on the Porter's Bluff road. Witness and Hill were going east towards Tyler when the deceased was killed. Witness was driving at the time the shots were fired, and at the same time was humped forward, whistling. Hill was sitting upright, talking to witness about witness's deceased father. The two first shots fired from the tree top were fired one right after the other, and by one man. Three places were found, at each of which a man stood or lay in ambush. One was on the north side of the road (the old "Chandler road"), and the others on the south side, and about three steps apart. No shots were fired from the north side of the road. Witness knew that the shots were fired from the beds in the tree top south of the road. He found gun-wadding near the tree top, and saw the stumps of briars in the tree top, which were cut by the buck shot. The witness did not see the defendant during the week previous to the killing, through which he stayed at the house of the

deceased. He saw Kennedy and Hendricks during that week, but not at Hill's house. Deceased took corn to Green's mill to be ground into meal, which he was to take to Tyler. Witness and Hill shelled the corn on the evening before the homicide. No one came to the house while they were shelling the corn. Witness had not been to Hill's house for over a year prior to this visit. He did not know how old Scott Hendricks was, but knew him to be married and to have several children. Witness had been hunting with him frequently, but the two had never been playmates. Witness came to this term of court with Henrietta, Al. and Peter Hill, but had talked with no one about the case since his arrival. Henrietta was the deceased daughter, Peter his brother, and Al. his nephew. The witness was unable to read a newspaper, and knew that the wadding he saw at the place of the homicide was fragments of the Tyler Democrat and Reporter only by what others who saw the fragments told him.

Witness and Monroe Hill went to the place of the killing on the Sunday after the homicide. They found the tracks of three men going from the place of the killing. From the place of the killing they followed the tracks to a point about two hundred yards distant, where a mule had been hitched. They then followed the tracks of the two men and the mule until they crossed Hog branch, where the tracks separated, the large run-down track turning off down the branch towards the river bottom. Witness and Monroe trailed the track of the mule and the remaining man until they crossed the Porter's Bluff road, going in a northerly direction, whence the tracks of the mule and the man led direct to Tom Kennedy's lot. Monroe and witness left deceased's house before sunrise, and reached Kennedy's house, over the trail of the mule and the man, between 7 and 8 o'clock. The mule tracks described turned out and were made by Tom Kennedy's mule, which the witness knew well. That mule was a red sorrel mule, with large feet, and reel-footed behind. Witness knew the mule and track well, though he had seen neither for more than a year prior to the homicide. When witness and Monroe arrived at Tom Kennedy's on that Sunday morning, the witness saw Link Kennedy. Witness was at Edom on the Saturday after the killing, but told nothing to 'Squire Cauthorn on that day about following the tracks to Tom Kennedy's house. Witness testified on the trials of Tom Kennedy and Scott Hendricks.

On re-direct examination the witness said that Riley Turner was at the mill when witness got there. He was riding Tom Kennedy's

little black mule. Witness did not testify at the last term of the court that he told 'Squire Cauthorn, on Saturday after the killing, about following the tracks of the mule and the man to Tom Kennedy's house. Deceased was in the habit of taking meal to Tyler on every Friday.

Monroe Johnson, a nephew of the deceased, testified for the State that he lived in Henderson county, Texas, about four hundred yards from Green's mill, and about a half mile from the house of the deceased. Witness was at home on the day of Hill's death. Witness's father's house, at which the witness lived, was situated about one hundred yards from the road, and there was a growth of cotton between the house and the road. Witness saw the deceased between 9 and 10 o'clock on the morning of his death. He was then walking along the road behind his wagon, which Ike Runnells was then driving. The wagon was loaded with meal and was traveling towards Tyler. Witness knew Scott Hendricks and had seen the defendant before the killing. Some twenty or thirty minutes before Hill and Ike Runnells passed the house with the wagon, the witness saw two men going around the path in front of the house. They passed witness at a distance of about one hundred yards, and were about fifty yards from the road. One of the men had a gun. The other, so far as the witness could see, was unarmed. The man who had the gun was the defendant. The man who was with him was Scott Hendricks.

Cross-examined, the witness stated that he was, at the time of this trial, fourteen years old. He did not know how long it had been since he saw the two men described. Deceased was the witness's uncle, and witness knew him well, but did not recognize him on that morning until his sister told him who he was, as he was passing along the road. One Dewberry was nearer to the witness than the two men whom he took to be defendant and Hendricks. Witness knew his uncle, the deceased, better than he did Hendricks or the defendant. He told his sister on that day that he saw two men going across the road. Witness did not know the two men until after the homicide, when he was told by Mr. Green that they were the defendant and Hendricks. Witness did not recognize the two men at the time he saw them, and would never have known them to be the men if he had not been told that they were the men who killed the deceased. Witness knew the gun carried by one of the men to be a shot-gun, because he saw the two barrels. He also saw the hammers and triggers, as the men walked sideways from witness. The cotton in the field where the witness was, was higher than wit-

ness's head, as likewise was the field fence. The cotton rows ran north and south, and the road east and west. The house was south of the road. The two men were going east when the witness saw them. Witness was going west, towards the house. Witness had to look down the cotton rows to see the men. The fence was higher than the head of either of the two men.

John Y. Green testified, for the State, that he lived in the north-east corner of Henderson county, and was the proprietor of the establishment known as Green's mill. The deceased lived about two miles from witness, and witness knew him well. Witness also knew the defendant and Scott Hendricks and Tom Kennedy, all of whom lived within two miles of him and a half mile of the deceased. Friday of each week was the witness's regular day for grinding corn into meal, in August, 1883. Witness did not grind corn on any day other than Friday. Deceased was killed at a point on the public road about two miles distant from the witness's mill. The point of killing was about one mile west from the point where the road from Green's mill intersects the Porter's Bluff and Tyler road. The direction from the mill to deceased's house was a little east of north. Tom Kennedy lived about the same distance from the mill, and about four hundred yards from Hill's house. Scott Hendricks, at that time, lived on the place of William Kennedy, the father of Tom, about a half mile from Hill's house. Defendant had been living on Willis Manley's place, and all of the parties lived in what was known as the Redland settlement, which is inhabited alone by negroes. All of the residents of the Redland settlement had their grinding done at the witness's mill. Louis Johnson's, the nearest house to the place of the homicide, was about one and a half miles west of that point. The nearest house east of that point on the road was about two miles distant, making a distance of three and a half miles between the houses on the road nearest the place of killing; and that is the longest distance between houses on the road between Green's mill and Tyler. Riley Turner was at the witness's mill on the morning of the homicide. Riley lived with Tom Kennedy. He got his meal ground, and started home between 8 and 9 o'clock. Deceased got to the witness's mill before Riley did, and told witness to grind Riley's corn first, which the witness did. Witness then ground deceased's meal, and the deceased left the mill about 10 o'clock to go to Tyler. At about 11 o'clock the witness was informed of the assassination of Hill on the road to Tyler. The information was brought by his wife, Melissa Hill. Witness, Mr. Ford and Mr. Jim Hines went to the body and found no one present

except Melissa, who had returned in advance, and a Mr. Shaver. Witness found tracks where two men had stood on the right of the road, about ten or twelve steps from where Hill was shot. He saw gun-wadding scattered from a hickory tree-top to the edge of the road at the point of the killing. The wadding was made of fragments of brown wrapping paper and pieces of the Tyler Democrat and Reporter. The deceased was struck on the side of the head and neck with five large-sized buck shot. From the place of the killing the witness back-trailed the foot-tracks down a neighborhood road about a half mile, in a southwest direction, to near a house, and thence in a west direction through the woods to within about four hundred yards of Louis Johnson's house; thence in a northwestern direction across the Porter's Bluff and Tyler road, in the direction of the residences of Tom Kennedy and Scott Hendricks, which was also in the direction of the house of the deceased. The witness measured those two tracks. One was the track of about a number eleven brogan shoe, run down on the outside. The other was the track of a number nine, rather neat dress boot. On the Monday following, witness saw Scott Hendricks at Edom, and thought the boot he wore resembled very much the track followed from the place of the killing. The measure was applied, and his boot was found to correspond exactly with the track. Witness followed no other track than the two described. Deceased had a meal contract to fill at Tyler, to which city he had been taking meal every Friday for about two months before the killing. Hill was killed in Van Zandt county by a man who stood in the forks of the road, or rather where the old " Chandler road " enters the road on which the killing took place. Another man stood ten or twelve steps from him.

Cross-examined, the witness stated that he had seen nothing of the defendant for two or three, and perhaps more, days before the killing. Witness did not know what kind of shoes the defendant wore at that time, nor was he familiar with the defendant's foot track. Witness followed the track from the place of killing to a point near Louis Johnson's house. He followed the track across the mill road, but not to the Porter's Bluff road. Witness only saw the tracks of two men.

Eck Beall testified that he knew the deceased in his life-time, and the three parties charged with his murder. Witness was on the old Hambrick place on the day of the killing. When witness reached the point where the killing occurred, he found paper gunwadding. One barrel of the gun appeared to have been wadded with brown wrapping paper, and the other with fragments of the

Tyler Democrat and Reporter newspaper. He saw also the tracks of three men, where they lay concealed. Those three places were each about ten steps from the place where Hill was said to have been when he was shot. The large run-down track was in the covert formed by the tree top, and the other two about fifteen feet from the tree top. The track nearest the road was made by a neat, narrow-toed, sharp-heeled boot, about number nine or ten in size. The third track was made by a neat, square-toed shoe, about a seven or eight in size. The track under the tree top was made by a broad-soled brogan shoe, the heels of which were run down on the outside. Witness followed these tracks to a point about two hundred yards distant from the ambush, where a mule had been hitched. Here the track of one of the men disappeared. Witness then followed the tracks of the mule and two men through the woods until they crossed Hog branch, where the large run-down track left the others and went southeast towards the Neches river bottom. The mule track and the neat boot track turned northward and traveled in that direction until they crossed the Porter's Bluff road below the place of the killing. At this point the party who was trailing with witness returned to the place of the killing, and witness continued until he trailed the tracks to a point within a quarter of a mile of Tom Kennedy's house, and about the same distance from Hendricks's house. From the point where the witness abandoned the trail the tracks were still going in the direction of Kennedy's house. The foot of the mule which made the track followed had a twist to it, and it "threw out" in walking, making a very peculiar track. Kennedy's big sorrel mule had a defective foot that made just that kind of a track. The mule and neat boot track traveled near together, but occasionally, when the boot track took short cuts across gullies, etc., they were as far as fifteen feet apart. The broad-bottom, run-down track was the track of the defendant on trial. The neat boot track was the track of Scott Hendricks. The track of the box-toed shoe was the track of Tom Kennedy. Witness back-trailed the broad, run-down track and the neat boot track to the Redland church, when they separated. Witness thence followed the broad track to Willis Manley's field, where the defendant had made a crop that year. He back-trailed the boot track to Scott Hendricks's house. On the Monday after the homicide, witness, in company with Jim Hines, trailed the big, broad, run-down track into Smith county, and to M. Dewberry's house, in which neighborhood the relatives of the defendant lived. The point where the witness and Hines struck that track on Monday was about three miles from

where it separated on Friday from the mule and boot track on Hog branch. That point (where they struck the track on Monday) was at the Selman crossing of the Neches river, and the witness and Hines went there to find it because they knew that defendant ordinarily crossed the river at that point in passing back and forth from Redlands to the houses of his relatives in Smith county. While following the tracks on Friday the witness and the party with him found a shot sack and a black-speckled handkerchief on the trail. The witness had previously, on Sunday, August 5, seen that handkerchief in the possession of the defendant, at his, witness's, house. Defendant came to see the witness to arrange to get money with which to pay a fine in case his wife was convicted in a case then pending against her in the justice's court at Edom. He told witness while there that he expected his wife to be convicted, and expected to be compelled to pay out a great deal of money,— all because of the fault of the deceased. Witness had a conversation with the defendant in his, defendant's, field while loading a wagon with fodder, on Monday, August 6. In that conversation defendant said to witness: "We are going to kill Edmond." Witness asked who "we" meant. He replied: "Me, Tom and another fellow." He declined to name the other "fellow."

Cross-examined, the witness said that the road over which he and Hines tracked the defendant to Smith county was a traveled road. The track was not visible all along the road, but appeared at intervals, and was the same track which was traced from the place of the homicide on the preceding Friday. No rain had fallen recently before the killing, and the ground was very dry. Witness did not follow the mule and boot track up to Kennedy's house, because he did not care to go entirely up to the house by himself. The witness knew the track of almost every negro who lived in the Redland settlement. He also knew the track of every horse he had ever owned. Witness was horseback when he followed the tracks on Friday, the day of but after the killing. Witness left Henderson county in 1871, but not because of an indictment there pending against him for assault to murder. Witness, after he left Henderson county, lived one year in Tarrant county, one year in Hill county, one year in Wise county, and then went to Clay county. The case pending against witness when he left has been settled since his return. Witness told deceased and Hines of the threat made to him against deceased. He did not see the defendant after August 6th, until about fifteen days after deceased was killed, when he saw him in jail at Tyler. Defendant then had on a pair of number

eleven, broad-soled brogan shoes, so badly run down at the heel on the outside that the rivets which secured the front part of the shoe to the hind part would leave an impression on the ground wherever the foot stepped. Such an impression was found on the large track followed from the place of the killing on the Friday of the homicide.

Scott Caldwell testified, for the State, that he lived in Smith county, about three miles distant from the residences of the defendant, Tom Kennedy and Scott Hendricks. About two weeks before the killing of the deceased, the witness heard the defendant say to Jim Anderson: " Old Trout (the deceased) has indicted my wife, but he will be killed before the next term of court." When the defendant made that statement to Anderson, the three parties, defendant, Anderson and witness, were about two hundred yards beyond the Neches river bridge. Defendant and Tom Kennedy had been for some time involved in trouble with the deceased about the female members of their families.

Cross-examined, witness said that he spoke of defendant's threat, first to Wood Kennedy and then to the deceased. Jim Anderson was present and heard witness tell deceased of the threat. Witness and deceased once — many years ago — had a difficulty, but had resumed friendly feelings long before the homicide. Jim Anderson and the deceased were friendly.

James Anderson testified, for the State, that he was making rails on Mr. Wilson's place at the time of the homicide. Some little time before the homicide the witness passed the defendant's house, traveling the road. He saw the defendant and Tom Kennedy sitting on a log behind the house. The log was about ten feet from the road along which the witness passed. As witness passed the house, he heard Tom Kennedy say to the defendant: " Edmond Hill must die! We must kill him before the next term of court!" Defendant replied to Tom: " Yes, we must kill him." A short time before the killing, the witness heard the defendant say, in the presence of Scott Caldwell: "If I had Edmond Hill here I would kill him." At another time in his, witness's, house, the defendant said that he would yet cut deceased down. The witness reported these threats to the deceased, and deceased made a complaint against defendant for threatening to kill him. Witness did not see the defendant or Tom Kennedy or Scott Hendricks at deceased's house on the night of the day deceased was killed. Witness saw Constable Raines hunting defendant, and told Raines of defendant's threats against deceased.

Cross-examined, the witness said that he knew nothing of the whereabouts of the defendant, Tom Kennedy and Scott Hendricks

on the night of Friday, the day of the homicide. Neither Willis Manley nor Wood Kennedy were at the deceased's house on that night. It was between daylight and sunrise, in the morning, when the witness heard the conversation between the defendant and Tom Kennedy on the log behind defendant's house. They did not see the witness until the witness spoke to them as he passed. They said nothing to the witness but "good morning." Witness and Tom Kennedy were friendly. The witness had a law suit once with Tom Kennedy's father, in whose behalf an execution was levied on witness's horse and corn. Witness knew Dack Manley, and remembered traveling with him from Canton, where they had been attending county court. Witness did not tell Dock Manley, on that occasion, near Hallman, on the road home, that he knew nothing whatever about this case, but that if d—d lies would send defendant, Kennedy and Hendricks to hell, he witness, was willing to swear to them. Witness did not, on another occasion, when working the road under John Veasey, tell one Anthony Robinson that, in a case like the present, where three men had murdered another, it was not, in his opinion, wrong to swear lies to crack their necks. Witness and deceased had a difficulty some years before the homicide. Witness knocked deceased in the head with a stick, and deceased had him prosecuted. They were friendly, however, at the time of the homicide. Defendant knew, when talking to witness, that witness and deceased were friendly.

Jack Williams testified, for the State, that on his way home from Chandler, on Sunday, August 5, 1883, he was overtaken by defendant, who, in the course of a conversation, said that the deceased had caused a prosecution to be instituted against his and Tom Kennedy's wives; that, as the white people generally believed the deceased to be a truthful negro, the prosecutions would result in convictions, but that while he could not beat the deceased at law, he could beat him in another way, and would kill him on the very first chance. Striking his breast he then said: " I am ready for him now."

Cross-examined, the witness said that at the time of this conversation he had known the defendant between one and two years, and was not intimate with him. Witness paid no attention to the threat, and thought no more about it until after Hill was killed. Witness remarked to defendant on the occasion of that conversation that he had always regarded Hill as a truthful negro. Defendant replied that Hill was the grandest rascal in Texas. Witness told these threats, for the first time, after the killing.

Joe Taylor testified, for the State, that he and Al. Hill were in

the bottom splitting rails on the day of the killing. They heard of the tragedy about noon through Frank Clemmons, who came to the bottom and reported the fact, and said that Ike Runnells was then at his house. Witness went home, got a mule, and went after Ike. Ike got up behind witness on the mule and the two started home. On their way they met Tom Kennedy and Scott Hendricks, going towards the Hopewell church, which church was in Smith county, some seven or eight miles from Redlands. The point of meeting was at the Adrian crossing of the Neches river, about one mile from Kennedy's house, and about the same distance from Hendricks's. The hour was between 12 and 1 o'clock. Kennedy was then riding his big sorrel mule under a man's saddle. Hendricks was riding Kennedy's small black mule under a woman's saddle. Witness did not know all of the parties who were at deceased's house on the night of the day of the killing. Neither defendant, Kennedy, Hendricks, Rias nor Willis Manley were there. Witness did not know whether or not Jim Anderson was there.

Fayette Raines testified, for the State, that he was the constable of the Edom beat in August, 1883. He knew the deceased, defendant, Kennedy and Hendricks. Cora Hill, the daughter of the deceased, was, at the time of the death of deceased, prosecuting the wives of defendant and Kennedy, and Cassie Williams, the sister of Kennedy, for an assault. Witness, at the same time, had in his hands a warrant against the defendant, founded upon an affidavit charging the defendant with uttering serious threats against the life of the deceased. Deceased had prosecuted the wives of defendant and Kennedy, and Cassie Williams, for disturbing the peace. One of the cases, witness did not know which, was tried before the killing, and resulted in an acquittal of the women. The regular court day in the Edom precinct justice's court came on the Friday after the Friday of the killing. Witness saw and talked with Jim Anderson on the day he, witness, was hunting for defendant.

Dack Manley testified, for the State, that he lived in Van Zandt county, Texas, near Redlands. The defendant lived on the place of the witness's father in 1883. He had not been home for several days before the homicide. He had moved his family away about a week before the killing, leaving his corn and cotton crop on the place. Witness loaned the defendant a double-barreled shot-gun, about ten days before the homicide, for the purpose of killing a squirrel for his sick child. Defendant was to return the gun on that night or the next morning, but the witness had never recovered it. He saw no more of the defendant after he borrowed the gun until after

his arrest.   When loaned to defendant one barrel was charged with "blue whistler" buck shot, and the other with low mould buck shot. Witness did not remember the kind of paper he used for wadding in loading that gun, but when he loaded it he had a Tyler newspaper and some brown wrapping paper in his hunting pouch.

Cross-examined, witness stated that he knew the defendant to have a very sick child when he borrowed the gun.   The witness remembered having a conversation with the witness Jim Anderson on the road home from Canton, where they had been attending court.   During the conversation this case was spoken of, and Anderson asked if witness had ever recovered his gun.   Witness replied that he had not.   He then asked what witness knew about this case.   Witness replied that he knew nothing about it.   Anderson said in reply that he knew nothing about it himself, but if d—d lies would send them (defendant, Kennedy and Hendricks) to hell, he was ready to swear them.   Witness did not know how long after the homicide this conversation with Anderson took place.   Witness went on a camp hunt two or three days after the homicide.   Witness made inquiries throughout the neighborhood for his gun, but could not find it.   Jim Anderson and deceased had a fight some two or three years before the homicide.   Witness never afterwards saw Anderson at deceased's house.

W. C. Thompson testified, for the State, that he was sheriff and jailer of Van Zandt county, before, at, and after the time of the killing.   Defendant was placed in the custody of the witness several days after the killing of the deceased.   Tom Kennedy and Scott Hendricks were in jail at that time, and had been there for some days.   On the day that he was incarcerated the defendant sent word to witness that he wanted to see him.   Witness brought him from the cage into the guard room and asked him what he wanted to talk about.   He replied that he wanted to talk about the killing of Edmond Hill.   Witness told him that the law made it his duty to warn him that whatever statement he made could and might be used in evidence against him on his trial.   It was witness's recollection that he repeated that warning two or three times, and asked defendant if he understood what he meant.   Defendant said that he understood the witness.   Witness then told him that he would listen to his statement, if, understanding his warning, he still desired to make it.   Witness could not repeat every word the defendant said, but he said in substance that Tom Kennedy and Scott Hendricks told him that they were going to kill the deceased, and offered to hire him to go with them; that he refused to accept any such proposition, but sub-

sequently went with them without hire or consideration. He told witness the particular position in which he, Kennedy and Hendricks stood by the side of the road, but witness could not remember the particular positions he assigned to each. He told witness that Scott Hendricks fired the first shot and exclaimed: " We got you now, by G—d," and that Tom Kennedy fired just as the team ran away. Defendant repeated his statement several times. To the best of witness's recollection, he said that he stood to the left of Kennedy and Hendricks when the shots were fired.

Cross-examined, the witness said that he could not remember who told him that defendant wanted to talk to him, but thought it was Constable Raines. According to witness's recollection, whoever brought him the word that defendant wanted to see him, told him that defendant wanted to talk to him about the case, go before the grand jury, and turn State's evidence. Witness told the foreman of the grand jury that defendant wanted to go before that body, and was told by the foreman that he would be notified when defendant was wanted. The foreman sent for the defendant within three or four hours, and witness took the defendant to, and turned him over to, the grand jury. Witness took Mr. David Tumlinson with him to hear the defendant's statement about the killing of the deceased.

David Tumlinson testified, for the State, that he lived for several years near the Redlands settlement in Van Zandt county, and knew the location of Green's mill. He had long known the defendant and Tom Kennedy, but did not know Scott Hendricks. Witness went with Sheriff Thompson to the jail to hear defendant's statement about the killing of deceased. Witness went at Sheriff Thompson's invitation. Defendant was brought from his cell into the guard room. The sheriff told him that whatever statement he made about the murder could be used in evidence against him. Defendant then proceeded to make his statement. He said that Tom Kennedy had tried repeatedly to hire him to kill the deceased, offering him $25, which he refused, as he had nothing against the deceased and did not want to kill him. He said that Tom Kennedy and Scott Hendricks then offered him $10 to go with them and have nothing to do with the killing, and that, fool like, he allowed himself to be over-persuaded, and induced to go; that he and Hendricks met near the Redlands church on the morning of the killing, whence they went to the forks of the road towards the mill; thence towards Johnson's house to the point where the roads fork, where they took the left hand, crossing the Edom and Tyler road, the road from Green's mill, and intersected the old John L. Davis road leading to

Chandler, and passed the Rice place to the place of the killing, where they found Tom Kennedy. When they arrived at the designated spot, they heard the wagon of the deceased coming, and took their positions, Tom Kennedy to his right and Scott to his left. Just as the wagon passed Scott fired, and as the mules ran off, Kennedy fired. Scott fired twice in rapid succession, and exclaimed: "By G—d, boys, we got him." Defendant then said: "I am innocent. I did not do it, and I don't intend to suffer for it." Defendant talked as though he was going to turn State's evidence, and witness thought that he was going to do so. Defendant said at the same time that after the shooting he went off down Hog branch, and to the Dewberry neighborhood. The State closed.

G. S. Gilchrist testified, for the defense, that he lived in Smith county, Texas. He had known the defendant about twelve years, and once had him employed on his farm. *En route* to Tyler about a week before the killing, witness saw the defendant sitting in Freeman Jones's yard. A few days after the homicide the witness saw Eck Beall, Hines, and others, whom he did not know, scouring the country for the defendant. Witness told them that they would never catch the defendant. Beal replied: "If we had found him last night, he would now be hanging to a tree." About two weeks after the killing the defendant came to witness's house and voluntarily surrendered, and witness took him to Tyler and placed him in jail.

Fayette Raines, called by the defense, testified that he took the defendant from the jail at Tyler to the jail at Canton. On his arrival at Canton witness went to and told Sheriff Thompson that the defendant wanted to see him about the Hill murder, and wanted to go before the grand jury.

Mary E. Lafton testified, for the defense, that she was the niece of the defendant, and in August, 1883, lived with her uncle Cale Jordan. Witness heard of the homicide on Saturday, the day after it occurred. Old man Bolden, passing the house on his return from Tyler, reported the fact. The defendant was at Cale Jordan's house on the day of the killing. He reached that house between 8 and 9 o'clock, and asked for his breakfast, which the witness prepared for him. The persons present at Cale Jordan's when the defendant reached the house on that morning were the witness, Mary Jordan, Eliza Thompson and Leander Swan. Leander, Eliza and witness were getting ready to go to a school exhibition at the Dewberry church when the defendant stepped into the house. After he ate

his breakfast the defendant sat about the house for some time, and then left. Witness did not know where he went. After he left, the witness, Leander, Eliza and Young Tully went to the exhibition. The exhibition was had on August 17, 1883, and that was the morning on which defendant was at Cale Jordan's house.

Cross-examined, the witness said that Mary Jordan, Cale's wife, was defendant's sister. Defendant did not tell the witness on that morning where he had been or where he was going. Defendant's wife was then at the house of his brother, Levi Thompson, about a half mile distant from Jordan's. Witness was inside of the house when the defendant arrived and when he left, and did not know from whence he came nor in which direction he went.

Mary Jordan, the sister of the defendant and the wife of Cale Jordan, testified substantially as did her daughter, Mary E. Lafton, and, in addition, that her husband's house was about twenty miles distant from the place where deceased was killed. She did not observe the coat, hat, shoes or pants worn by the defendant while at her house on the morning of the homicide.

· Leander Swan testified, for the defense, substantially as did Mary E. Lafton and Mary Jordan, and, in addition, that she, witness, saw the defendant at her husband's house, on Cale Jordan's farm, on the night before the killing, which was also the night before she saw him at Cale Jordan's house. He then asked if his family, who were then at Levi Thompson's, had arrived. She did not, either on that night or next morning, notice either his hat, coat, pants or shoes. Some men came to witness's house on Monday night looking for the defendant, but witness did not tell them when she saw him last.

Anthony Robinson testified, for the defense, that on one occasion, while working the road under Mr. Veasey, the State's witness, Jim Anderson, in talking about this case, said that, in his opinion, in a case like this, where three men had waylaid and murdered another, it was not wrong to swear lies for the purpose of breaking their necks.

Cross-examined, witness said that he went to Tom Kennedy's about sunrise to get Riley Turner to take some corn to mill for him. Tom's wife, Susan, told witness that Tom was still in bed. Witness went back to Tom's about 9 o'clock to get his meal, and Susan told him that Tom had gone to the Hopewell church. Riley Turner had not then returned from mill.

The motion for new trial raised the questions discussed in the opinion.

*Burge & Russell, Kearby & McChesney* and *H. B. Marsh* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant and one Tom Kennedy and one Scott Hendricks were jointly indicted for the murder of one Edmond Hill in Van Zandt county on the 17th day of August, A. D. 1883. They were tried separately. Appellant was convicted of murder of the first degree, with a life penalty in the penitentiary.

Twenty-one bills of exception, saved on the trial to various rulings made by the court, appear in the transcript of the record. 1. The first, second and third bills show a discrepancy between the facts stated in the body of the bill and the explanation appended by the judge to the bill with regard to the time when the special *venire-men* mentioned had been excused by the court. In his explanation the learned judge says he excused them, when their names were regularly called on the list, on account of sickness as shown by physicians' certificates. We take it the explanation states the facts. No excuse for a special *venireman* can be heard and determined, ordinarily, until after the *venire* has been called, placed in the jury box, and sworn to answer questions touching their qualifications as jurors. (Code Crim. Proc., arts. 618, 619, 620.) Any excuse before that time granted by the court is without authority of law. Ordinarily no one who is not present to present his excuse for himself can be excused, save by consent of both parties. (Code Crim. Proc., art. 621.) But if upon a call of the list it be made to appear satisfactorily to the court that a *venireman* whose name is called is absent on account of sickness, or other unavoidable cause over which he has no control, the court may undoubtedly excuse his attendance. (*Thuston* v. *The State,* 18 Texas Ct. App., 26.) But when the court exercises this authority without consent of parties, or over objection by a defendant, it should only do so upon the most satisfactory evidence of unavoidable necessity, and even in such cases a defendant might be entitled to the issuance of an attachment in order to verify or disprove the truth of the ground of excuse. In this instance, though objection was made to the action of the court, it does not appear that defendant applied for an attachment to have the jurors brought forthwith before the court (Code Crim. Proc., art. 618), and we will not revise the action.

2. Bills of exceptions 4, 6 and 9 present objections to the rulings of the court in holding jurors competent and qualified who were

challenged for cause by defendant, and upon whom defendant was compelled to exercise peremptory challenges on account of such rulings, he having exhausted all of his peremptory challenges before the jury was finally completed. One of the jurors, Ellis, stated on his *voir dire* examination that he had heard the previous trials of appellant's co-defendants, Kennedy and Hendricks, and that he had made up and formed an opinion as to their cases, and thought the result reached in those cases (convictions) was all right, but that he had no opinion of the guilt or innocence of defendant in this case, and that he could give defendant a fair and impartial trial in this case. (Acts 19th Legislature, p. 91.) The mere fact that a juror has heard the evidence on a prior trial of the same case will not disqualify him as a juror. (*Parchman* v. *The State*, 2 Texas Ct. App., 228; *Wade* v. *The State*, 12 Texas Ct. App., 358.) There must be established in his mind a conclusion of the guilt or innocence *of the accused*, and this conclusion must be such as will influence him in his verdict. The other jurors stated that they had formed no opinion and could give the defendant a fair and impartial trial. One of them, Franks, stated that he had an impression in the case by hearing the testimony in the Kennedy and Hendricks cases. It was held in the Rothschild case, 7 Texas Ct. App., 520, that "a mere impression, though derived from the evidence (heard on a former trial), does not disqualify a juror unless it would influence his finding."

3. Bill of exception No. 5 presents this question: The special *venireman* as shown on the list served on defendant was D. W. Hardigree, but when the name was called one W. D. Hardigree, the father of D. W., who lived with him, appeared and answered, and it was shown that W. D. had been summoned, and not D. W. Defendant objected to W. D., and asked for an attachment for D. W. The court stood W. D. aside, and refused the attachment for D. W. This ruling was correct. Where a juror is misnamed in the copy of the special *venire* served on the defendant, it is the proper practice to stand him aside. (*Swofford* v. *The State*, 3 Texas Ct. App., 77; 72 Ala., 164.) It was not error to refuse an attachment for D. W. Hardigree, because D. W. had not been summoned, and an attachment is only authorized "*for any person summoned* who is not present, to have *him* brought forthwith before the court." (Code Crim. Proc., art. 618.)

4. Bill of exception No. 7 shows that the juror Landrum stated that where the law gave a juror the option to inflict death or imprisonment for life, he would not, under any circumstances, inflict

the death penalty. On objection by the State for cause, the challenge was sustained. Persons with conscientious scruples against the infliction of the death penalty are incompetent jurors, notwithstanding the statute permits the jury to fix the punishment at imprisonment for life. (59 Miss., 19 and 484; 6 Parker's C. R., 15.)

5. The eighth bill shows that the juror Franks had, within the three preceding months, served as a juror for four days in the county court of Van Zandt county. Defendant challenged him for this cause, and the court held him competent. There was no error in this. One of the causes of disqualification of a juror named in the civil statutes is, " he must not have served as a juror *for six days* during the preceding six months in the district court, or during the preceding three months in the county court." (R. S., art. 3010, subdiv. 5.) The juror had only served four days, and was, consequently, not disqualified.

6. The tenth bill shows that, after having exhausted his twenty peremptory challenges, defendant proposed to challenge the juror Luton peremptorily, which the court refused to allow, because he had already exhausted all his peremptory challenges. This ruling was correct. If after exhausting his peremptory challenges he had challenged the juror for cause, and the court had erroneously overruled said challenge and forced the objectionable juror upon him, the error in the ruling would have been cause for reversal. (*Loggins* v. *The State*, 12 Texas Ct. App., 65; *Heskew* v. *The State*, 17 Texas Ct. App., 161; *Hollis* v. *The State*, 8 Texas Ct. App., 620.)

7. The eleventh exception was taken to the witness Runnells being permitted to state, over objection, that he heard just after the shooting the voice of Scott Hendricks, a co-defendant, exclaim: " Oh yes, boys, that got him !" Being made at the time and place of the shooting, the exclamation was admissible as *res gestæ.* "What is said and done by participants under the immediate spur of a transaction becomes part of the transaction, because it is then the transaction that speaks. . . . What the participators in the transaction instinctively spoke or acted, did or said, is not hearsay; it is part of the transaction itself." (Whart.'s Crim. L. (8th ed.), § 262.)

8. The witness Green, as shown by the twelfth bill, after having testified that one of the tracks seen by him at the place of the killing was the track of a nice dress boot or shoe, etc., was asked if he afterwards saw a similar boot or shoe which he took to be the one that made the tracks spoken of. Witness was permitted to state, over objection, that on the day the examining court with regard to

the killing was held by a justice of the peace, he saw Scott Hendricks, one of the co-defendants, wearing a boot just like the one which should have made the track spoken of. This evidence was admissible as a circumstance to be considered as throwing some light upon the transaction, the evidence of which, besides the confessions hereafter to be noticed, was wholly circumstantial.

9. The thirteenth bill was to the State's being permitted to prove the state of feeling between the co-defendants, Kennedy and Hendricks, and the deceased Edmond Hill, and that the feeling was bad and the parties unfriendly. If not conclusively shown before this testimony was introduced, a conspiracy between these parties and defendant to kill the deceased was afterwards fully established, and the evidence was admissible to show motive.

10. Matter complained of in the fourteenth and fifteenth bills was withdrawn from the jury by the court, and they were expressly instructed not to consider it in determining their verdict.

11. A constable who had executed the process in cases pending in a justice's court can certainly testify that he knew such cases were or have been pending, without its being necessary to produce the record of the justice to prove the fact. We cannot, therefore, see that any error was committed as complained of in the sixteenth bill of exceptions. But if the justice's record was the best evidence of the facts proposed to be proven, still in this case the ruling of the court would be error without prejudice, because the matters relating to the prosecutions pending before the justice were proven by other legitimate testimony in the case, and, such being the case, the evidence of the constable as to the facts became unimportant.

12. Bills of exceptions Nos. 17 and 18 relate to confessions made by defendant. It is contended that the confessions were inadmissible because induced in the first instance by fear, and in the second by a promise and the hope that defendant would be allowed to turn State's evidence and thereby secure immunity from punishment. When the question was raised as to the admissibility of the confession, the court very considerately and properly had the jury to retire from the court room whilst the circumstances connected with the confessions were being inquired into, and these bills of exception show, with the explanations annexed by the judge, all the facts pertaining to the mode, manner and circumstances under which they were ascertained to have been made, and upon which the court admitted them as evidence. In brief, these antecedent facts are, substantially, that appellant had been arrested for this crime and placed in the jail of Smith county. One Raines, a constable of Van Zandt

county, was sent by the sheriff of this latter county to bring the prisoner from Smith county to Van Zandt for trial. There had been considerable excitement amongst the negroes about the killing of Hill; a reward had been offered for the murderers; some threats had probably been made of mobbing them, and these facts had been communicated to appellant. When Raines proposed to take him from the jail in Smith county, appellant expressed fears for his safety, which Raines quieted by promising him every protection. In taking the prisoner from the jail at Tyler to Canton, Raines and his prisoner had to pass by the place where the killing occurred, and when they reached the spot defendant made a full confession to Raines. Raines did not warn him of the consequences of such a confession, or that it might be used as evidence against him; but he told defendant, after the latter had made his confession, that "if he, defendant, would tell Thompson, the sheriff of Van Zandt, about it, and go before the grand jury, he might come clear, or may be he would not be prosecuted." When they reached the Van Zandt jail, Raines informed Thompson that defendant wanted to talk with him. Thompson and one Tumlinson went to the jail, had defendant brought out into the guard room, and the defendant told Thompson that he wanted to talk to him about the killing of Hill. Thompson told him that he, defendant, was charged with the killing, and that it was his duty as an officer to notify him that anything he said might be used against him on the trial. He and Tumlinson both testified that he, Thompson, warned defendant three times of the consequences of his statements, before defendant made his confessions. Thompson made no promises of any kind to defendant, before or after his confession.

These were the antecedent facts and circumstances proven before the court with regard to said confessions in the absence of the jury. Upon these facts the court held the confessions admissible, and, upon the return of the jury into the box, Thompson and Tumlinson were both permitted, over objections by defendant, to testify as to the confessions made by defendant to Thompson. Defendant's objections were that the confession was inadmissible because, at the time so made, defendant was laboring under the hope that he would be permitted to go before the grand jury, turn State's evidence against his co-defendants, and thereby gain immunity for himself from punishment for the crime.

A confession, to be admissible where the party is in custody or arrest when it is made, must be "freely made, without compulsion or persuasion," and voluntarily made after he has first been cau-

tioned that it may be used against him. (Code Crim. Proc., arts. 749, 750.)

If any promise was made or hope given defendant that he would be allowed to turn State's evidence, it was made by the constable, Raines, after defendant had told him all about the killing and his participation in it. This confession to Raines was not introduced in evidence. Now, can Raines's statement made to defendant (which we quote from the explanation of the judge), that "if he, defendant, would tell Thompson, the sheriff of Van Zandt, about it, and go before the grand jury, he might come clear, or may be he would not be prosecuted," be called a promise? We think not. It was a mere suggestion or opinion of Raines. It was not even, properly speaking, advice given by Raines to defendant as to what he should do; it was a mere suggestion as to what he might do, with an opinion as to what might be the result of such action. But, suppose that it was a promise, it is evident that the promise was not, and was not intended to be, a positive one. What then? Mr. Wharton furnishes us with the rule. He says: "and it has been generally held that any advice to a prisoner by a person in authority telling him it would be better for him if he confesses vitiates a confession induced by it. Lately, however, this has been greatly qualified, and it is now held that there must be a positive promise, made or sanctioned by a person in authority, to justify the exclusion of the confession." (Whart., Crim. Evid. (8th ed.), § 651.) Numerous authorities are cited by the author supporting this doctrine. "In conclusion" of his discussion of the subject, the same author says: "We may hold that a confession is only to be excluded on the ground of undue influence where it is elicited by temporal inducement, e. g., by threat, promise or hope of favor held out to the party in respect of his escape from the charge against him by a person in authority under circumstances likely to lead to a false statement; or where there is reason to presume that such person appeared to the party to sanction such a threat or promise. If the influence applied was such as to make the defendant believe his condition would be bettered by making a confession, true or false, this excludes; but, if not, the confession is admissible." (Id., § 673.)

Raines neither made him a promise nor compelled or persuaded defendant to adopt or follow his suggestion. For aught that appears, then, his sending for Sheriff Thompson was a voluntary act upon defendant's part, and the rule then applies as announced in *Lopez* v. *The State*, 12 Texas Ct. App., 27: "If, however, he should freely, and without compulsion or persuasion, send for the prosecut-

ing officer and propose to confess, and the officer should first caution him that it might be used against him, the confession would be admissible, though he might have made it in the hope of immunity. Fear of legal punishment would not of itself be such compulsion as would deprive him of his freedom of action in the premises, and especially so if he was first cautioned that his confession might so be used. Nor would an agreement entered into by the parties after a confession so made, to the effect that if defendant would turn State's evidence and testify to the facts confessed he would be released and relieved from prosecution and punishment, operate to destroy the legality and admissibility of such a confession, should he afterward repudiate the agreement and refuse to testify. For such agreement would only be subordinate to the confession, and would form no part of it." (See, also, *Womack* v. *The State*, 16 Texas Ct. App., 178.) We are of opinion the confession to Thompson was not obnoxious to the objections we have discussed, and that a sufficient predicate having been laid for its introduction, the court did not err in admitting it.

13. The nineteenth bill of exceptions was saved to a refusal of the court to permit the grand juror Boggess to testify to statements made in the grand jury room by defendant with regard to his inducements for making confessions to Raines and Thompson. The witness asked the court if, under his oath as a grand juryman, he could divulge what had transpired in that body; and the court refused to compel him to testify. Evidence of what transpires in the grand jury room "is only admissible when, in the judgment of the court, it becomes material to the administration of justice that it should be allowed." (*Clauton* v. *The State*, 13 Texas Ct. App., 139; 64 Maine, 267.) In view of the rule and of all the facts connected with the confession, we cannot say that the court erred in the ruling complained of.

14. The twenty-first bill of exceptions is that the court permitted one Spinks, who was deputy district clerk, to swear the last six members of the jury. The objection to Spinks was that he was a practicing attorney-at-law, and had causes then and there pending for trial on the docket of the district court. We know of no law inhibiting an attorney-at-law from acting as deputy clerk. It is not shown that Spinks was interested as an attorney or otherwise in the case on trial. The regular clerk was sick, and Spinks was his deputy. There was no error in permitting him to swear the jury in the presence and under the direction of the court.

15. The twentieth bill of exceptions was saved to the overruling of defendant's motion for a new trial. This motion for new trial em-

braces twenty-two grounds, most of them relating to the matters saved by the bills of exceptions which we have discussed. No bill of exception was taken to the charge given by the court to the jury, and no additional instructions were requested by defendants. We find no fundamental error in the charge. It appears to be a full and able exposition of the law applicable to the various phases of the case. But a single objection is urged to it in the motion for a new trial, and that objection is to a sentence which is most decidedly favorable to the defendant.

We have given this case a thorough examination, and have discussed, we believe, every question so ably presented by the counsel for appellant in his brief and also in his able argument made before the court. He has conducted the case with marked ability.

That defendant is guilty of this murder, whether he fired the fatal shots which took the life of Edmond Hill, or not, is incontestably established by the evidence, and we are of opinion the evidence, independent of his own confessions, sufficiently establishes his guilt. According to his confessions he entered voluntarily into a conspiracy to assassinate the deceased, and was present in pursuance of the plan at the time and place it was consummated. He has had a fair and impartial trial, so far as we can judge from the record before us, and by his own acts he has merited the punishment assessed. The judgment is in all things affirmed.

*Affirmed.*

[Opinion delivered December 16, 1885.]